194 N.J. Super. 510 (1984)
477 A.2d 403
SHARON COLUCCI, AN INFANT, BY HER GUARDIAN AD LITEM, JOAN COLUCCI; ET AL. PLAINTIFFS,
v.
THOMAS NICOL ASPHALT CO., SOUTH BRUNSWICK ASPHALT CO., HENRY J. KING, ROB-E-SON, AND BIL-JIM CONSTRUCTION CO., INC., DEFENDANTS-RESPONDENTS, JAMES OPDYKE AND LEROY OPDYKE, DEFENDANTS-APPELLANTS. JAMES OPDYKE, LEROY OPDYKE AND CARMELA OPDYKE, PLAINTIFFS-APPELLANTS,
v.
THOMAS NICOL ASPHALT CO., SOUTH BRUNSWICK ASPHALT CO., HENRY J. KING, ROB-E-SON, AND BIL-JIM CONSTRUCTION CO., INC., DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Submitted May 30, 1984.
Decided June 20, 1984.
*512 Before Judges KING and DREIER.
William J. Hill, attorney for appellants (William J. Hill, on the brief).
Britt & Riehl, attorneys for respondents Henry J. King and ROB-E-SON (Dennis F. Wagenblast, on the brief).
The opinion of the court was delivered by DREIER, J.A.D.
James Opdyke has appealed in these two cases which on this court's motion have been consolidated for the purpose of this opinion. In his case as a plaintiff James Opdyke is joined by his parents in seeking affirmative relief for his injuries caused by a collision between the car he was driving (owned by his father) and a street sweeper operated by defendant King. In the companion case, his passenger, Sharon Colucci, made claims against the same defendants as well as against James and his father as the operator and owner of the vehicle in which she was riding. The Colucci matter was formerly consolidated with a third case involving the claim of another passenger, but a deconsolidation order was entered prior to trial.
These cases are unusual from a procedural standpoint. James Opdyke had retained the services of William J. Hill, Esq. to represent him on his affirmative claim, and his insurance company retained another law firm to defend him in the two actions brought by his passengers. The respective carriers for Opdyke and King negotiated a monetary settlement in the two passenger cases, leaving unresolved the issue of the apportionment of the settlement between the two drivers, which issue they agreed to try. Hill did not participate in this settlement discussion nor in the decision to proceed to trial on the unresolved issue of apportionment of liability. In fact, when he *513 heard about the trial, he appeared in the office of the Assignment Judge at 7:45 in the morning and made an application for a stay. The Assignment Judge, in chambers, informed Hill that he would not stay the trial, although there is no record of that in-chambers application.[1] Hill contended that he was informed by the attorney for the passenger Colucci that he was not prepared for trial on the date in question and that if forced to go to trial he would take a dismissal and reinstitute the action. It was only after leaving the judge's chambers on the day before the trial that Colucci's attorney and the two defense counsel agreed to settle the damage issues, whereupon the Colucci matter proceeded to trial on liability alone, to the surprise of Hill.
The Assignment Judge also asked Hill why he did not "take over and try the case." Hill responded that he was not so requested by the insurance company and did not request it himself because "[t]hey did not know me from Adam and they had hired a law firm ... to represent the defense.... They know nothing about me, my background or experience. I thought it would be a total waste of time, your Honor, and I still think it would have been. There is no way they would have allowed me to try the case." Parenthetically, we note that a letter from Opdyke's carrier's attorneys in opposition to the summary judgment motion noted that had there been a request, *514 plaintiff's personal counsel would have been permitted to try the case.[2]
The parties and all eye witnesses testified at the trial. From James Opdyke's own testimony it appeared that he had been operating his vehicle with the cruise control engaged at approximately 50 miles per hour. He came around a curve at approximately 35 miles per hour (the speed limit) when he saw a cloud of dust. He had no time to put on his brakes or sound his horn or do anything to avoid the accident. Since the accident, he was able to measure the distance from which one would have visibility of the driveway to the construction site which the sweeper was leaving and he agreed that it was approximately 250 feet. He also knew that there was heavy equipment at the site which exited the driveway at slow speeds, and therefore, was aware that he might have to slow down when he came around the curve. Apparently, the cloud of dust was caused by the failure of the co-defendants to utilize a sprinkler system to hold down the dust when the sweeper was in operation.
The issues before us are the application of res judicata or collateral estoppel and the jury instructions given in the Colucci trial.

I
Hill has noted in this appeal that he would have utilized depositions that had been taken of defendant King to show certain discrepancies in his testimony and that the motivation of the carrier's attorney was not the same as his would have been *515 in representing Opdyke as a plaintiff. He takes issue with the concession made by the carrier's attorney in summation when he said: "We are not saying that Jimmy [Opdyke] was totally without fault, but was Jimmy totally at fault?" In urging these points the Opdykes are attempting to equate this case with Reardon v. Allen, 88 N.J. Super. 560 (Law Div. 1965), where a judgment in a District Court property damage subrogation action was held not to preclude a separate trial on liability brought by the insured. Since Opdyke was a party to both actions, we do not have to reach the question of mutuality of estoppel discussed in Desmond v. Kramer, 96 N.J. Super. 96 (Cty.Ct. 1967), and Continental Can Co. v. Hudson Foam Latex Prod., 129 N.J. Super. 426 (App.Div. 1974). We will, however, apply a similar analysis since we recognize that different interests were litigated in the Colucci case from those advanced by Opdyke in his own suit. As the court stated in Continental Can Co.:
... [W]e say only that in our judgment policy considerations inherent in the doctrine of collateral estoppel forbid that its dependency rely on any one test, including the test of mutuality. Whether collateral estoppel should apply depends  as the cases cited in both Reardon and Desmond acknowledge  on many factors, all of which are considered because they contribute to the greatest good for the greatest number so long as fairness is not sacrificed on that alter. We see no reason why `mutuality of estoppel,' sanctified only by antiquity, should dictate from a preemptive position. It must be considered, along with all the other pros and cons. But the final result must be a sum of all the integers, and not a product of zero simply because one of the many numbers multiplied together is zero. [129 N.J. Super. at 430]
As succinctly stated in McAndrew v. Mularchuk, 38 N.J. 156, 161 (1962):
... Generally the question to be decided is whether a party has had his day in court on an issue, rather than whether he has had his day in court on that issue against a particular litigant.
1 Restatement, Judgments 2d, § 27 at 250 (1980) uses the term "Issue Preclusion":
Issue Preclusion  General Rule
When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim.
*516 Section 28 governs exceptions to the general rule of issue preclusion and reads in part as follows:
Although an issue is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, relitigation of the issue in a subsequent action between the parties is not precluded in the following circumstances:
* * * * * * * *
(3) A new determination of the issue is warranted by differences in the quality or extensiveness of the procedures followed in the two courts or by factors relating to the allocation of jurisdiction between them; or
* * * * * * * *
(5) There is a clear and convincing need for a new determination of the issue (a) because of the potential adverse impact of the determination on the public interest or the interests of persons not themselves parties in the initial action, (b) because it was not sufficiently foreseeable at the time of the initial action that the issue would arise in the context of a subsequent action, or (c) because the party sought to be precluded, as a result of the conduct of his adversary or other special circumstances, did not have an adequate opportunity or incentive to obtain a full and fair adjudication in the initial action.
Exception 3 is, in effect, Reardon v. Allen, see illustrations 6 and 7. Section 28(5) contains broad exceptions. Comment j at 284 states:
... [T]he court in the second proceeding may conclude that issue preclusion should not apply because the party sought to be bound did not have an adequate opportunity or incentive to obtain a full and fair adjudication in the first proceeding. Such a refusal to give the first judgment preclusive effect should not occur without a compelling showing of unfairness, nor should it be based simply on a conclusion that the first determination was patently erroneous. But confined within proper limits, discretion to deny preclusive effect to a determination under the circumstances stated is central to the fair administration of preclusion doctrine.
The Reporter's Note at 289 sheds further light on subsection (5):
Subsection (5) represents an effort to distill from case and commentary those situations in which competing policy considerations outweigh the policy factors underlying direct and collateral estoppel. Such situations are, and should be infrequent, but the basic principles should be sufficiently flexible to accommodate them when a clear need for a redetermination of an issue has been established.
This situation is similar to the effect of a decision in a personal injury claim on a later wrongful death action. See 2 *517 Restatement, Judgments 2d, § 46 at 16 (1980). This principle was recognized in Alfone v. Sarno, 87 N.J. 99, 112 (1981), discussing the Tentative Draft precursors of sections 27 and 46. The court there stated:
One important effect of applying res judicata principles to the wrongful death action is that issue preclusion will prevent relitigation of those essential issues concerning liability actually litigated and determined in the earlier personal injury action [citing and quoting the predecessor of section 46(3)]. Among others, such issues determined in the personal injury action may include negligence or percentages of negligence under our comparative negligence statute.... These matters may not be relitigated by either party in the wrongful death action if determined as part of the prior judgment.
Performing the case-by-case analysis, and recognizing that under Continental Can Co. there is no hard and fast rule, we have reviewed the interests at stake in the first trial in this case. We see that the carriers were not trying a simple property damage subrogation suit as in Reardon. Damages had already been stipulated at $67,500 for the Colucci plaintiffs, and the other pending passenger suit had been the subject of settlement discussions in the $20,000 range. Therefore, even discounting the effect of the Opdyke suit, the attorneys in the Colucci matter knew that the trial would result in the apportionment of approximately $87,500.
We note further that all parties and witnesses testified and that the jury verdict finding James Opdyke responsible for 60% of the accident was not unreasonable in light of (1) Opdyke's having prior knowledge of the movement of heavy equipment in and out of the driveway yet rounding the curve at the speed limit possibly with his cruise control engaged and (2) with a usual 250 foot visibility obscured, Opdyke's taking no action to avoid the accident, but rather riding into the cloud of dust. Perhaps Hill, had he been trying the case, would have raised additional issues or convinced the jury that his client was responsible for 50% or less of the causative negligence, but this issue has been determined in a full trial in his client's name with substantial interests at stake. When we add all the factors, as suggested by the court in Continental Can Co., we *518 conclude that the Opdykes are barred by the Colucci judgment. Even if we were to consider the Colucci judgment as one in which the carrier's interest alone had been adjudicated, under the sound reasoning in Continental Can Co. incorporating the standards from both Desmond and Reardon, we would find the issue of Opdyke's negligence to have been fully and fairly adjudicated in the Colucci suit.

II
On the direct appeal in the Colucci suit the Opdykes contend that it was error for the trial judge to have omitted the ultimate outcome charge. We do not agree that there was any violation of the principles established in Roman v. Mitchell, 82 N.J. 336, 345-347 (1980), in the trial judge's failure to give an ultimate outcome charge. The judge was presiding at a trial where there was no issue of the plaintiff passenger's negligence.[3] Therefore, there was no affirmative claim by Opdyke that would have justified the ultimate outcome charge, and we see no authorization or direction in Roman v. Mitchell that would justify an ultimate outcome charge concerning matters collateral to the issue before the court. As was noted earlier, Continental Can Co. establishes the principle that the collateral estoppel or res judicata effect of a decision is a matter of law to be determined by a judge in the second proceeding after weighing the appropriate factors bearing upon the issue. There is no need to confuse a jury with an attenuated charge on this subject.
Since we have determined that there was no error in the charge as given, we affirm the judgment in the Colucci matter. Since we also have determined that the Assignment Judge properly applied the doctrine of collateral estoppel granting *519 summary judgment in favor of the defendants in the Opdyke case, we also affirm that order.[4]
NOTES
[1] We note that the Assignment Judge, at oral argument of the summary judgment motion in the Opdyke suit, chastised Hill for not making "a formal application before the trial judge so there would be a matter of record." Hill noted that he "did not feel it was necessary to ask [the trial judge] to put it on the record when [Hill] had already been told by the Assignment Judge that nothing would be done." The Assignment Judge responded: "The Assignment Judge was not officially handling the case. It was before [the trial judge] and you had a right to appear before [him] and place on the record your objections." We suggest that if this problem appears in the future a record be made before the judge who makes the particular decision so that we may know what happened and why. This would avoid problems of characterization when an order of one judge is orally placed on the record in a proceeding before another.
[2] Counsel retained by the carrier and Opdyke could at least have conferred and determined which of them would try particular aspects of the case. See Compilation of Administrative Directives for New Jersey Judges (1981), at 26:

Two attorneys representing same litigant. It sometimes occurs that two attorneys appear in behalf of a litigant, one defending for the insurer and the other private counsel engaged by the litigant. Both cannot be permitted to try the case simultaneously but they may alternate at different phases of the proceeding except that both might be permitted to examine doctors.
[3] The sole issue for the jury to consider was the apportionment of negligence between the two drivers. We realize that this apportionment had some effect on the companion suit wherein one of the drivers was a plaintiff, and the far better practice would have been for the cases to have been consolidated.
[4] We have not been supplied with a copy of the order granting summary judgment, however, all parties agree that there was such an order and it is called for in the oral opinion of the Assignment Judge placed on the record on September 16, 1983, and is also referred to in a supplemental order to amend the complaint to add parties defendant dated September 27, 1983. We will, therefore, not require further documentation.