Lloyd DOWDELL, Plaintiff,

v.

UNIVERSITY OF MEDICINE AND DENTISTRY OF NEW JERSEY, Defendant.

No. 98–5823 (JAG).

United States District Court, D. New Jersey.

April 20, 2000.

Matthew R. Grabell, Deutsch, Resnick, Green & Gramigna, Hackensack, NJ, for plaintiff.

Alex Moreau, Deputy Attorney General, Trenton, NJ, for defendant.

## OPINION

GREENAWAY, District Judge.

### INTRODUCTION

Defendant University of Medicine and Dentistry of New Jersey ("UMDNJ") has filed motions for dismissal and summary judgment, pursuant to Fed.R.Civ.P. 12(b)(6) and 56(c), respectively, before this Court. UMDNJ seeks dismissal of Dowdell's employment discrimination claims raised pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII"), and the New Jersey Law Against Discrimination, N.J.S.A. § 10:5–1, et seq. ("NJLAD").[1] Title VII, as well as 28 U.S.C. §§ 1331 and 1338, confer jurisdiction upon this court. Based on the facts[2] and applicable law, as discussed

---

**1.** This Opinion issues in support of this Court's Order of March 31, 2000, granting Defendant's motion to dismiss and denying Defendant's motion for summary judgment.

**2.** In addressing the instant motion to dismiss, this Court considers the pleadings and at-

herein, this Court grants UMDNJ's motion to dismiss.

### FACTS

On May 15, 1995, defendant UMDNJ hired Dowdell, a 45 year-old African–American male, as a Federal Relations Coordinator in its Office of Government Relations ("DGR"). *See* Complaint at ¶ 6. ("Compl."); Compl., Ex. 1 (Equal Employment Opportunity Commission Charge of Discrimination of 11 April 1997 ("EEOC Charge")). Dowdell's tenure with UMDNJ continued through July 29, 1996. *See* Compl., Ex. 1.

Dowdell alleges that on numerous occasions during his period of employment his Caucasian supervisor, Russ Malloy ("Malloy"), made discriminatory comments and took discriminatory actions predicated on Dowdell's race. *See id.* at ¶ 6. Specifically, Dowdell asserts that "[he] was continually harassed on the basis of [his] race and treated differently for that reason alone." Dowdell Aff. at ¶ 4; *See* Compl. at ¶¶ 3, 6, 14, 15, 20, 21. In his complaint, Dowdell iterated detailed examples of the harassment and discrimination he suffered under Malloy. *See* Compl. at ¶ 6.

As one example of such harassment, "[Dowdell] was treated differently than other members of Malloy's staff.... [W]hen introducing his staff members to Congressional and political leaders, Malloy introduced Ms. Evelyn Moore, a white staff member as '[his] better half' while [Dowdell] was not introduced at all." Compl. at ¶ 6(i). Dowdell alleges that Malloy warned him that African–Americans were "not worth their salt," and Dowdell should "not involve [himself] with them." *Id.* at ¶ 6(ii). Additionally, on those occasions when plaintiff arranged meetings between black leaders and DGR representatives, Malloy canceled the meetings, indicating that "[w]e have better things to do." *Id.* at ¶ 6(iii).

In September of 1995, soon after Dowdell began his employment in the DGR, he expressed an interest in attending the Million Man March in Washington, D.C. Malloy questioned Dowdell's intention and stated, "What possible benefit will come from that ... you are wasting your time. And, you should be careful. With all of you together in one place, if someone wanted to wipe you all out, it would be easy in one shot." *Id.* at ¶ 6(iv) (elision in original). Finally, in a later conversation regarding Dowdell's future with the DGR, Malloy advised him to apply to the Urban Planning Department, because the majority of its employees were African–American, and "[Dowdell] would be better off 'with his kind.'" *Id.* at ¶ 6(vii).

In addition to these overt remarks, Malloy also "refused to send [Dowdell] to a mandatory supervisor's training session, until he was directed to do so by the Senior Vice President for Administration Finance." *Id.* at ¶ 6(v). However, on the day of the training session, Malloy summoned Dowdell into the DGR offices and forced him to miss the seminar. As a result, Malloy "delayed [Dowdell's] advancement opportunities." *Id.* Additionally, Malloy canceled Dowdell's annual trip to the Congressional Black Caucus Meeting. *See id.* at ¶ 6(vi).

"On various occasions" throughout the one year period of his employ, Dowdell complained verbally to Stanley S. Bergen ("Bergen"), President of UMDNJ, regard-

---

tached exhibits "which [are] a part thereof for all purposes," Fed.R.Civ.P. 10(c), *see Rose v. Bartle,* 871 F.2d 331, 340 n. 3 (3d Cir.1989), as well as Dowdell's state "judicial proceedings ... which [are] not subject to reasonable dispute over [their] authenticity." *Southern Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group Ltd.,* 181 F.3d 410, 426 (3d Cir.1999) (citations omitted); *see Children's Seashore House v. Waldman,* 197 F.3d 654,

662 n. 7 (3d Cir.1999) (citing *Churchill v. Star Enter.,* 183 F.3d 184, 190 n. 5 (3d Cir.1999)). Additional facts iterated within this Opinion provide background information only and do not impact this Court's decision regarding UMDNJ's motion to dismiss. UMDNJ has also moved for summary judgment. Based on this Court's analysis, and its ruling on Defendant's motion to dismiss, the motion seeking summary judgment is denied as moot.

ing Malloy's comments. *Id.* at ¶ 9. Dowdell notified other executives within UMDNJ as well, "including, but not limited to, Mr. Walter Pino." *Id.* at ¶ 10. When the circumstances became untenable, Dowdell filed a complaint with Catherine Bolder, the Affirmative Action Officer in UMDNJ's internal Equal Employment Opportunity office. *See id.* at ¶ 7. This July 15, 1996, internal complaint addressed "some, if not all, of Malloy's ... remarks" to plaintiff. *Id.* Ten days later, Dowdell sent another written complaint addressing Malloy's comments and conduct to Karen Kavanagh, UMDNJ's Vice–President of Human Resources. *See id.* at ¶ 8. Neither President Bergen, Pino, Bolder, nor Kavanagh "[took] any effective remedial action[, and] they did not investigate plaintiff's claims" at any time subsequent to plaintiff communicating his concerns to them. *Id.* at ¶ 11.

Dowdell asserts that these failures to investigate and cure "caused [him] to endure ... an increasingly hostile working environment." *Id.* Additionally, Dowdell contends that "[he] would have complained [on other occasions] had it not reasonably appeared to him that doing so would be ineffective because Defendant-principals condoned or were wilfully indifferent to [Malloy's] conduct." *Id.* at ¶ 12.

In a remarkable coincidence, Malloy happened to complete what appears to be a rather exhaustive audit of the DGR within four days of Dowdell's written complaint to Kavanagh. *See* Certification of Matthew R. Grabell in Support of Plaintiff's Brief in Opposition to Defendant's Motions for Dismissal and Summary Judgment ("Pl's. Cert."), Ex. A, Letter of 29 July 1996 from Russell Malloy to Lloyd Dowdell ("Malloy Letter"); Certification of Alex Moreau in Support of Defendant's Motions for Dismissal and Summary Judgment ("Def's.Cert."), Ex. 2. Malloy's comprehensive appraisal, addressing not only DGR finances but also governmental funding, led him to state:

> UMDNJ has come under increasing pressure from a variety of sources to achieve significant cost reductions and maximize operating efficiencies. Reductions in State funding levels, federal cuts in Medicare, the continuing evolution of managed care in the marketplace, as well as numerous other factors have all combined to place the institution in a position where the need for reduction in staff is an unavoidable reality.

Pl's. Cert., Ex. A. The Malloy Letter concluded:

> Accordingly, I regret to inform you that your current position as an Program Coordinator is being eliminated effective August 12, 1996. In lieu of the normal two (2) weeks notice provided employees in layoff situations you will be provided ten (10) days pay. Consequently, your last day of work will be Monday, July 29, 1996. This action in no way reflects upon your performance, nor upon the institution's appreciation for the contributions you have made to the development of UMDNJ as a leader in its field.

*Id.* (errors in original). Dowdell maintains that Malloy dismissed him in direct retaliation for his complaints regarding Malloy's discriminatory behavior and comments. *See* Compl. at ¶¶ 3, 12.

Following Malloy's July 29th termination of plaintiff, President "Bergen encouraged [Dowdell] to apply for various open positions [within] UMDNJ, ... assur[ing] plaintiff that he would be considered for any positions to which he applied." *Id.* at ¶ 19; *see* Dowdell Aff. at ¶ 8. Based upon President Bergen's guarantees, Dowdell subsequently applied for at least five positions within UMDNJ, including "Program Coordinator, Grant Administrator, Information Technical Specialist, Continuing Education Coordinator[,] and Program Development Specialist." Compl. at ¶ 20.

Despite President Bergen's pledges to the contrary, from Dowdell's date of termination through April 1997, UMDNJ never responded to any of these applications, nor did UMDNJ give any indication that they had been considered. *See id.* Plaintiff alleges that "these, and other positions

remained open and . . . UMDNJ continued to seek applications from non–African–American persons [having] plaintiff's qualifications," *id.*, and "that these positions were [eventually] awarded to white individuals." Dowdell Aff. at ¶ 9.

Having never received a response to any of his numerous applications, Dowdell sent a letter to Malloy on April 7, 1997, in which he stated that "[o]n or·about July 29, 1996, [Malloy and UMDNJ] advised [him] that [he] was being laid off due to financial reasons." Def's Cert., Ex. 3, Letter of 7 April 1997 from Lloyd Dowdell to Russell Malloy ("Dowdell Letter"). Dowdell informed Malloy that "it [was his] understanding that [UMDNJ] and [DGR were] no longer under the financial constraints [they were] encountering during the time [he] was laid off," that he had "been informed that many individuals laid off during the time [he] was let go [were] being called back to work," and that he had "yet to hear from [Malloy or UMDNJ] regarding an offer for [him] to come back to work." *Id.* Dowdell stated further that "[he] believe[d] that [his] layoff had more to do with discrimination," and he requested "a reasonable explanation" as to why UMDNJ and/or DGR could not rehire him. *Id.*

Following this letter, Dowdell sought redress with the Equal Employment Opportunity commission ("EEOC") and the New Jersey Division on Civil Rights ("NJDCR"), and, on April 11, 1997, he filed a formal charge of discrimination. *See* Compl., Ex. 1; Pl's Cert., Ex. B; Def's Cert., Ex. 4. Dowdell's EEOC Charge alleged discrimination based on race as well as retaliation. *See* Compl., Ex. 1; Pl's Cert., Ex. B; Def's Cert., Ex. 4. In addition, the EEOC Charge contained a space for indicating the "Latest Date Discrimination Took Place," in which Dowdell typed "07/29/96." Compl., Ex. 1. In relating the particulars of his claims, Dowdell stated:

> On July 15, 1996, I filed an internal EEO complaint with Catherine Bolder, Affirmative Action Officer, against my supervisor, Russ Molloy, Director Government Relations. I complained that I was being discriminated against because of my race. Subsequent to my complaint, Mr. Molloy told me that I was being terminated for economic reasons. After my termination, I applied for the position of Program Coordinator, Grant Administrator, Information Technical Specialist, Continuing Education Coordinator and Program Development Specialist. I have not received any response to my applications.
>
> I believe that I was discriminated against in violation of Title VII of the Civil Rights Act of 1964, as amended because of my race/Black and retaliated against for having complained about discrimination.

*Id.* (errors in original). On April 7, 1998, Dowdell's attorneys sent a letter to President Bergen relating the foregoing allegations. *See* Pl's Cert., Ex. C, Letter of 7 April 1998 from Matthew Grabbell to Stanley Bergen ("Demand Letter"). At the close of the letter, plaintiff both extended an offer to settle the matter for $150,-000.00 in lieu of litigating his claims, and indicated his desire to engage in "meaningful discussions towards settlement." *Id.* at 6.

### PROCEDURAL HISTORY

On August 12, 1998, Dowdell filed a complaint in the Superior Court of New Jersey in Essex County against defendants UMDNJ and Dr.· Bergen. In his state complaint, Dowdell alleged unlawful discrimination and termination based on race, as proscribed by the NJLAD. *See* Pl's. Cert., Ex. E. On October 8, 1998, the EEOC notified Dowdell of his right to sue regarding his Title VII claims. *See* Pl's Cert., Ex. D (EEOC Right to Sue Letter). Less than one month later, on November 6, 1998, the Honorable Harry A. Margolis, J.S.C., entered an Order dismissing the state court complaint "with prejudice." *Dowdell v. University of Med. & Dentistry of New Jersey*, No. ESX–L–8588–98, Order at 2 (Law Div., Essex County Ct. filed Nov. 6, 1998) ("*Dowdell I* "). Judge Margolis indicated that the dismissal rested

upon Dowdell's "failure to state a claim upon which relief can be granted, pursuant to [N.J.Civ.P.] R. 4:6–2(e)." *Id.* at 1. On November 23, 1999, the New Jersey Superior Court, Appellate Division, affirmed Judge Margolis's decision. *See Dowdell v. University of Med. & Dentistry of New Jersey,* No. A–1937–98T3, slip op. at 5 (App.Div. filed Nov. 23, 1999) (per curiam); *see generally* Pl's. Cert., Ex. G (Plaintiff's Notice of Appeal, filed Nov. 25, 1998). On December 28, 1998, Dowdell filed the within complaint before this Court. *See* Compl.

## DISCUSSION

UMDNJ seeks either dismissal or a grant of summary judgment, via Fed. R.Civ.P. 12(b)(6) or 56(c), respectively, of all of Dowdell's claims. Defendant's motion presents this Court with a novel issue regarding preclusion of Title VII claims. Under a motion to dismiss raised via Rule 12(b)(6), "the court is required to accept as true all the allegations of the complaint and all inferences arising from them." *See Anjelino v. The New York Times Co.,* 200 F.3d 73, 87 (3d Cir.1999) (citing *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)). In considering a motion to dismiss for failure to state a claim upon which relief can be granted, the Court may only dismiss a complaint if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *see Ransom v. Marrazzo,* 848 F.2d 398, 401 (3d Cir.1988); *Guyette v. Stauffer Chem. Co.,* 518 F.Supp. 521, 526 (D.N.J. 1981).

While this Court accepts as true all well-pled allegations and draws reasonable inferences in the plaintiff's favor, *see, e.g., Gomez v. Toledo,* 446 U.S. 635, 636, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980), it nevertheless may dismiss a complaint where, under any possible set of facts derivable from the complaint, the plaintiff is not entitled to relief. *See Conley,* 355 U.S. at 45–46, 78 S.Ct. 99; *see also Neitzke v. Williams,* 490 U.S. 319, 326–27, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989) ("[This procedure] streamlines litigation by dispensing with needless discovery and factfinding"). In addition, "[t]o the extent that the court considers evidence beyond the complaint in deciding a Rule 12(b)(6) motion, [the motion to dismiss] is converted to a motion for summary judgement." [3] *Anjelino,* 200 F.3d at 88 (citing Fed.R.Civ.P. 12(c)); *see Robinson v. Dalton,* 107 F.3d 1018, 1021 (3d Cir.1997); *see also* Fed.R.Civ.P. 56(c).

Dowdell raises claims cognizable under both Title VII and the NJLAD in the complaint before this Court: (1) Workplace harassment, as proscribed by the NJLAD; (2) Retaliatory termination, as barred under the NJLAD; (3) Discriminatory failure to hire, as prohibited by the NJLAD; (4) Workplace harassment, as forbidden under Title VII; (5) Retaliatory termination, as prohibited under Title VII; and (6) Discriminatory failure to hire, as barred by Title VII. *See* Compl.

The state court in this matter rendered a judgment as to only the first two claims listed, namely, UMDNJ's unlawful harassment and subsequent retaliatory termination of Dowdell under the NJLAD. In dismissing the state action, the trial court found that New Jersey's statute of limitations rendered Dowdell's claims stale.[4] UMDNJ acknowledges that Dowdell's "state complaint did not allege any unlaw-

---

**3.** As noted, this Court includes background information from outside the pleadings that was disregarded in deciding the instant motion—hence this Court declines to convert the motion to dismiss via Rule 12(b) to a motion for summary judgment. *See supra* note 2.

**4.** Neither party disputes that the state court's dismissal with prejudice rested on an expiration of the state limitations period. *See* Pl's. Br. at 13 ("[Dowdell's] state law claims ... were dismissed on statute of limitations grounds by [the trial court].") (emphasis removed); Def's. Br. at 13 (asserting that "[Dowdell's] NJLAD claims from the state court complaint were dismissed based on statute of limitations grounds").

fully discriminatory conduct by UMDNJ or Dr. Bergen after July 1996," and that he "sought damages solely for alleged violations of the NJLAD" occurring up to July 29, 1996. Def's. Br. at 3. Nevertheless, UMDNJ contends that the state court's pronouncement operates as a bar to the subsequent adjudication in this Court of both the state claims and any related claims. This Court, therefore, addresses the precise effects the state judgment exerts on the federal system.

### I. Full Faith and Credit

 In determining the level of preclusive effect that the state judgment possesses in federal court, this Court must consider 28 U.S.C. § 1738, the full faith and credit statute. Section 1738 "directs all [federal] courts to treat a state court judgment with the same respect that it would receive in the courts of the rendering state. Federal courts may not employ their own rules ... in determining the effect of state judgments, but must accept the rules chosen by the State from which the judgment is taken." *Matsushita Elec. Indus. Co. v. Epstein,* 516 U.S. 367, 372, 116 S.Ct. 873, 134 L.Ed.2d 6 (1996) (citations omitted). While it remains true that "[i]f the state courts would not give preclusive effect to the prior judgment, the courts of the United States can accord it no greater efficacy," *Haring v. Prosise,* 462 U.S. 306, 313 n..6, 103 S.Ct. 2368, 76 L.Ed.2d 595 (1983) (citations omitted), such a situation does not exist here.

 As noted, the New Jersey trial court dismissed Dowdell's complaint "with prejudice." *See Dowdell I,* at 2. Under New Jersey law, "[a] *dismissal with prejudice* 'constitutes an adjudication on the merits as fully and completely as if the order had been entered after a trial.' " *Feinsod v. Noon,* 261 N.J.Super. 82, 84,

617 A.2d 1234 (App.Div.1992) (quoting *Velasquez v. Franz,* 123 N.J. 498, 507, 589 A.2d 143 (1991)) (emphasis added). Of particular import to Dowdell's case, where a judge dismisses a complaint pursuant to N.J.Civ.P.R. 4:6–2(e), as Judge Margolis did here, the dismissal "operate[s] as an adjudication on the merits for res judicata purposes." *Velasquez,* 123 N.J. at 508, 589 A.2d 143.

Even were this Court to disagree with the result in the state matter, its preclusive effect within the state courts would remain unchanged, because it would still constitute an adjudication on the merits that would bar Dowdell from attempting subsequent enforcement of his claims in the New Jersey courts. *See Cornblatt v. Barow,* 153 N.J. 218, 243–46, 708 A.2d 401 (1998); *see also Atkinson v. Pittsgrove Tp.,* 193 N.J. Super. 23, 27–28, 471 A.2d 1215 (1983).[5] As this Court is Constrained to impart to the state judgment the same preclusive effect in federal court that it would enjoy within the state courts, the reiterated claims require dismissal. *See Matsushita,* 516 U.S. at 372, 116 S.Ct. 873.

Dowdell, however contends that the state judgment never reached the "merits" of his claim, in that the only issue litigated pertained to the statute of limitations. See Pl's Br. at 13 ("[I]t was the issue of statute of limitations that was jactually litigated' and jdetermined,' not the substantive merits of Dowdell's claims."); See supra note 4, (recognizing that neither party disputes the grounds for the state dismissal with prejudice). This contention sidesteps the chief obstacle raised by the state judgment — that it would preclude Dowdell from restating his NJLAD claims in any New Jersey court. The preclusive effect of the judgment as opposed to the underlying rationale of the decision — defines the boundary of this Court's inquiry.[6]

---

5. In particular, New Jersey reposes within the discretion of its trial courts the "decision whether to dismiss with or without prejudice," *Cornblatt,* 153 N.J. at 244, 708 A.2d 401 (quoting *Crispin v. Volkswagenwerk,* A.G., 96 N.J. 336, 346, 476 A.2d 250 (1984)), and, as noted, a dismissal with prejudice carries

claim preclusive effect against the plaintiff. *See Velasquez,* 123 N.J. at 508, 589 A.2d 143.

6. Dowdell's argument raises and then ignores the central fact that, at a minimum, that state court adjudicated the merits of the statute of limitations issue. That determination pre-

*See* Angel v. *Bullington,* 330 U.S. 183, 190, 67 S.Ct. 657, 91 L.Ed. 832 (1947) ("[T]he merits of a claim are disposed of when they are refused enforcement").

Any consideration of Dowdell's restated NJLAD claims would require that this Court both ignore the state judgment and revisit the limitations issue already determined by the state—affirmative actions beyond this Court's powers. Thus, § 1738 and New Jersey jurisprudence compel this Court to dismiss Dowdell's previously adjudicated NJLAD claims of workplace harassment and retaliatory termination. Consideration of Dowdell's remaining claims, *see* claims 3–6 *supra* p. 532, which were not explicitly raised before the state court, shall be addressed in the remainder of this Court's opinion.

## II. The Entire Controversy Doctrine

■ As regards these remaining state and federal claims, UMDNJ argues that New Jersey's "entire controversy" doctrine bars Dowdell from raising any NJLAD claims that he could have brought earlier, whether distinct from the original claim or not. Indeed, the entire controversy doctrine constrains a plaintiff from "withhold[ing] part of a controversy for separate litigation even when the withheld component is a separate and independently cognizable cause of action." *Paramount Aviation Corp. v. Agusta,* 178 F.3d 132, 137 (3d Cir.1999). As delineated by the New Jersey Supreme Court, the doctrine

serves three essential purposes: (1) avoidance of piecemeal litigation through complete consideration of interrelated claims; (2) fairness to the parties in the action as well as to those possessing a material interest in its outcome; and (3) efficiency and economy. *See DiTrolio v. Antiles,* 142 N.J. 253, 267, 662 A.2d 494 (1995); *see also Agusta,* 178 F.3d at 137 (outlining same purposes).

■ At a minimum, the entire controversy doctrine mandates joinder of those claims arising from "the same overall transaction" involving the parties already named in the lawsuit. *Crispin,* 96 N.J. at 343–44, 476 A.2d 250 (recognizing minimum requirements of doctrine and opining that enlargement of entire controversy doctrine to include mandatory joinder of parties may be appropriate); *see also Cogdell v. Hospital Ctr.,* 116 N.J. 7, 17, 560 A.2d 1169 (1989) (broadening scope of doctrine to mandate joinder of "all parties with a material interest, one that can affect or be affected by the judicial outcome of a legal controversy"). In looking to the facts comprising Dowdell's "legal controversy" with UMDNJ, this Court concludes that Dowdell's remaining state law claim falls within the minimal mandates of the entire controversy doctrine and, hence, that Dowdell both could have and should have raised this claim in his initial action.

■ Dowdell's sole remaining NJLAD claim concerns UMDNJ's failure to hire him in the months following his termi-

---

cludes this Court from further consideration of any identical limitations issues or arguments as they pertain to Dowdell's reiterated NJLAD claims. See *Jalil v. Avdel Corp.,* 873 F. 2d 701, 704–05 (3rd Cir. 1989) (noting that New Jersey dictates that "[w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim") (citing *Colucci v. Thomas Nicol Asphalt Co.,* 194 N.J. Super. 510, 515, 477 A.2d 403 (App. Div. 1984); Restatement (Second) of Judgments 27 at 250 (1982)), *cert. denied* 493 U.S. 1023, 110 S.Ct. 725, 107 L.Ed.2d 745 (1990).

In effect, both New Jersey and federal principals of issue preclusion would bar Dowdell from rearguing the merits of timeliness or tolling, as these were arguments which either were, or could have been, raised before the state court. See *Jalil,* 873 F.2d at 704–05; *Alfone v. Sarno,* 87 N.J. 99, 111, 432 A.2d 857 (1981) (holding that it would not be fair to require defendants to relitigate issues previously adjudicated); *Colucci,* 194 N.J. Super. at 515–16, 477 A.2d 403 ("[T]he question to be decided is whether a party has had his day in court on an issue"); *see also Migra v. Warren City School Dist. Bd. of Ed.,* 465 U.S. 75, 77 n. 1, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984) ("Issue preclusion refers to the effect of a judgment in foreclosing relitigation of a matter that has been litigated and decided.").

nation. When Dowdell originally sought resolution of his employment discrimination claims in the state court, he did not raise this particular claim. While a failure-to-hire claim could be viewed as distinct from Dowdell's initial NJLAD claims, "[t]he entire controversy doctrine does not require commonality of legal issues[; r]ather, the determinative consideration is whether distinct claims are aspects of a single larger controversy because they arise from interrelated facts." *DiTrolio,* 142 N.J. at 271, 662 A.2d 494. This basic tenet of the doctrine required Dowdell to raise his NJLAD failure-to-hire claim in the state proceeding, because this cause of action arose from "the same overall transaction" between himself and UMDNJ and involved the same set of operative facts.

Application of the entire controversy doctrine to Dowdell's remaining NJLAD claim settles the matter in UMDNJ's favor, because this claim could have been raised in the initial state proceeding: (1) Dowdell knew of his termination on July 29, 1996; (2) he became aware of UMDNJ's alleged failure to hire by April 7, 1997; and, (3) he did not pursue his state action until August 12, 1998—a full year and four months following the last conduct of which he complains. At the time Dowdell brought his state court action, all of his NJLAD claims were ripe, cognizable, and ready for adjudication. The entire controversy doctrine mandates that Dowdell's failure—not raising in his initial action the remaining NJLAD claim—must preclude him from asserting it now. Accordingly, the NJLAD failure-to-hire claim is also dismissed. *See id.*

---

7. As a point of clarification, this Court considers only matters regarding claim preclusion in the remainder of this Opinion and does not engage in an analysis of issue preclusion. While the term "res judicata" encompasses both claim and issue preclusion, this Court eschews its use, and, instead, opts for the distinction and clarity which inhere via application of the terms "claim preclusion" and "issue preclusion." *See Migra,* 465 U.S. at 77, n. 1, 104 S.Ct. 892 ("In order to avoid confusion resulting from the two uses of 'res judicata,' this opinion utilizes the term 'claim preclusion' to refer to the preclusive effect of

### III. Claim Preclusion and Title VII

■ Dowdell's federal claims present this Court with a more difficult question. As a preliminary matter, it should be noted that the New Jersey entire controversy doctrine, as an "application of traditional res judicata [7] principles ... [and] an aspect of the substantive law of New Jersey," requires this Court to enforce the doctrine in hearing a federal claim as well. *Rycoline Prods., Inc. v. C & W Unlimited,* 109 F.3d 883 (3d Cir.1997). Furthermore, the doctrine itself could be read to preclude Dowdell as a matter of law from raising his federal claims, because state courts possess concurrent jurisdiction over Title VII claims. *See Yellow Freight Sys., Inc. v. Donnelly,* 494 U.S. 820, 110 S.Ct. 1566, 108 L.Ed.2d 834 (1990) (holding that jurisdiction over Title VII claims not exclusive to federal courts).

Such an interpretation, however, would not entirely settle the question. While the entire controversy doctrine bars Dowdell's NJLAD claims, its preclusive effects do not automatically extend to his Title VII claims as a matter of law. *Cf. Kremer v. Chemical Constr. Corp.,* 456 U.S. 461, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982) (noting that state court decisions *might* preclude Title VII federal actions). This is due primarily to the fact that the EEOC did not issue Dowdell's right to sue letter until October 8, 1998, some two months into the state litigation and over 500 days after he filed his EEOC complaint.[8]

■ In order to apply claim preclusion as a bar to Dowdell's suit, this Court

a judgment in foreclosing relitigation of matters that should have been raised in an earlier suit.") (Blackmun, J.).

8. This Court's hesitancy to apply the entire controversy doctrine rigidly to preclude Dowdell's Title VII claims arises from the fact that receipt of the right to sue letter could be viewed as a procedural prerequisite to federal suit. *See, e.g., McNasby v. Crown Cork & Seal Co., Inc.,* 888 F.2d 270, 282 (3d Cir.1989); *Gooding v. Warner–Lambert Co.,* 744 F.2d 354, 358 (3d Cir.1984).

must find that "a particular issue, although not litigated, could have been raised in an earlier proceeding." *United States v. Athlone Indus., Inc.*, 746 F.2d 977, 983–84 (3d Cir.1984). An application of claim preclusion also requires: "(1) a final judgment on the merits in a prior suit [9] involving; (2) the same parties or their privities; [10] and (3) a subsequent suit based on the same cause of action." *Id.* Therefore, in addition to determining whether Dowdell could have raised his Title VII claims in the earlier proceeding, this Court must ascertain whether Dowdell's two lawsuits are based on the same cause of action—a determination which "turn[s] on the essential similarity of the underlying events giving rise to the various legal claims." *Churchill*, 183 F.3d at 194 (citations omitted).

As to Dowdell's ability to raise his federal claims before the state court, the Supreme Court has stated that the filing of a timely charge of discrimination with the EEOC is "not a jurisdictional prerequisite to filing a Title VII suit, but a requirement subject to waiver as well as tolling when equity so requires." *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982). In addition, the Third Circuit has indicated "that the same is true of the issuance of a right-to-sue letter; such a letter is not a 'jurisdictional' requirement in the constitutional sense, but rather a statutory requirement designed to give the administrative process an opportunity to proceed before a lawsuit is filed." *Gooding*, 744 F.2d at 358 (citations omitted).

The Third Circuit, nevertheless, mandates that "[f]iling a charge and receiving a right-to-sue letter are prerequisites to an individual's bringing suit under Title VII." *McNasby*, 888 F.2d at 282; *see* 42 U.S.C. § 2000e-5(f)(1), (3); 29 C.F.R. 1601.28(a)(1) and (2). Indeed, the failure to pursue the necessary administrative remedies mandates dismissal "as a matter of law." *Ditzel v. University of Medicine & Dentistry of New Jersey*, 962 F.Supp. 595, 602 (D.N.J.1997) (dismissing complaint where plaintiff had failed to even allege filing of charge with either EEOC or state agency); *see Bishop v. Okidata*,

9. As discussed earlier, the state dismissal with prejudice operated as an adjudication on the merits within the New Jersey state courts, and the Full Faith and Credit Act mandates that this Court treat it in an identical fashion. *See Matsushita*, 516 U.S. at 372, 116 S.Ct. 873; *see also* Part I *supra* pp. 533–34. This determination should be dispositive as to whether the judgment carries the same weight under a federal inquiry of what constitutes a "judgment on the merits." Even were this Court to disregard the state effects granted to the dismissal and undertake an insular federal analysis, an identical result would be reached for two reasons.

First, the state order dismissing Dowdell's action "with prejudice" operates as an adjudication on the merits under federal standards, foreclosing the need for federal reconsideration of the actual issues litigated. *See* Fed. R.Civ.P. 41(b) ("Unless the court ... otherwise specifies, [an involuntary] dismissal ... operates as an adjudication on the merits."); *Federated Dept. Stores v. Moitie*, 452 U.S. 394, 399 n. 3, 101 S.Ct. 2424, 69 L.Ed.2d 103 (1981) (holding that a dismissal for failure to state a claim constitutes a "judgment on the merits"); *see also Bell v. Hood*, 327 U.S. 678, 682, 66 S.Ct. 773, 90 L.Ed. 939 (1946) ("[I]t

is well settled that the failure to state a proper cause of action calls for a judgment on the merits."). Second, even if this Court were to reexamine the underlying issues to determine whether a dismissal via statute of limitations grounds constitutes an adjudication on the merits under federal law, the same conclusion would be reached. *See Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 228, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995) ("The rules of finality, both statutory and judge-made, treat a dismissal on statute-of-limitations grounds ... as a judgment on the merits.") (citing Fed. R.Civ.P. 41(b); *United States v. Oppenheimer*, 242 U.S. 85, 87–88, 37 S.Ct. 68, 61 L.Ed. 161 (1916)).

10. Both parties in the present action were engaged in the state suit. Dowdell's attempt to distinguish his earlier suit from the present one, on the ground that the parties have changed, carries little weight. The mere insertion or deletion of certain UMDNJ officials does not prevent application of preclusion to his instant claims. *See Gregory v. Chehi*, 843 F.2d 111, 121 (3d Cir.1988) (holding that prior judgment in favor of defendant government entity served to preclude claims against individual officials).

*Inc.*, 864 F.Supp. 416, 424 (D.N.J.1994) (requiring plaintiff to conform to administrative requirements of Title VII prior to bringing claims).

These requirements, therefore, would appear to have precluded Dowdell from raising his Title VII claims in either state or federal court prior to receipt of the EEOC right-to-sue letter. The statute's administrative procedures, however, do not obligate a complainant to wait indefinitely for an EEOC resolution—if the EEOC fails to take any action or reach any determination within 180 days of the initial filing of the charge, the EEOC must, if asked, issue a right to sue letter to the complainant. *See* 42 U.S.C. §§ 2000e–5(f)(1) and (3).[11] Indeed, the EEOC's own regulations mandate that "the employee may obtain a right-to-sue letter upon request once 180 days have passed from the filing of the charge, § 29 C.F.R. 1601.28(a)(1), but the Commission may issue a right-to-sue letter earlier if it finds that it cannot complete its consideration of a charge within 180 days of filing, § 1601.28(a)(2)." *E.E.O.C. v. Associated Dry Goods Corp.*, 449 U.S. 590, 595 n. 6, 101 S.Ct. 817, 66 L.Ed.2d 762 (1981).[12]

11. Specifically, the relevant portion of 42 U.S.C. § 2000e–5(f)(1) provides that

[i]f a charge filed with the Commission pursuant to subsection (b) of this section is dismissed by the Commission, or if within one hundred and eighty days from the filing of such charge or the expiration of any period of reference under subsection (c) or (d) of this section, whichever is later, the Commission has not filed a civil action under this section or the Attorney General has not filed a civil action in a case involving a government, governmental agency, or political subdivision, or the Commission has not entered into a conciliation agreement to which the person aggrieved is a party, the Commission, or the Attorney General in a case involving a government, governmental agency, or political subdivision, shall so notify the person aggrieved and within ninety days after the giving of such notice a civil action may be brought against the respondent named in the charge (A) by the person claiming to be aggrieved or (B) if such charge was filed by a member of the Commission, by any person whom the charge alleges was aggrieved by the alleged unlawful employment practice;

and, the applicable portion of 42 U.S.C. § 2000e–5(f)(3) states that

[i]f a charge filed with the Commission pursuant to subsection (b) of this section is dismissed by the Commission, or if within one hundred and eighty days from the filing of such charge or the expiration of any period of reference under subsection (c) or (d) of this section, whichever is later, the Commission has not filed a civil action under this section or the Attorney General has not filed a civil action in a case involving a government, governmental agency, or political subdivision, or the Commission has not entered into a conciliation agreement to which the person aggrieved is a party, the Commission, or the Attorney General in a case involving a government, governmental agency, or political subdivision, shall so notify the person aggrieved and within ninety days after the giving of such notice a civil action may be brought against the respondent named in the charge (A) by the person claiming to be aggrieved or (B) if such charge was filed by a member of the Commission, by any person whom the charge alleges was aggrieved by the alleged unlawful employment practice.

12. The text of the EEOC guidelines reinforces the Supreme Court's interpretation. Specifically, 29 C.F.R. § 1601.28(a)(1) declares that

[w]hen a person claiming to be aggrieved requests, in writing, that a notice of right-to-sue be issued and the charge to which the request relates is filed against a respondent other than a government, governmental agency or political subdivision, the Commission shall promptly issue such notice as described in § 1601.28(e) to all parties, at any time after the expiration of one hundred eighty (180) days from the date of filing of the charge with the Commission, or in the case of a Commissioner charge 180 days after the filing of the charge or 180 days after the expiration of any period of reference under section 706(d) of Title VII as appropriate;

and, 29 C.F.R. 1601.28(a)(2) discloses that

[w]hen a person claiming to be aggrieved requests, in writing, that a notice of right-to-sue be issued, and the charge to which the request relates is filed against a respondent other than a government, governmental agency or political subdivision, the Commission may issue such notice as described in § 1601.28(e) with copies to all parties, at any time prior to the expiration of 180 days from the date of filing the charge with the Commission; provided, that the District Di-

The complainant then has ninety days from the time he receives the letter to file a civil action in federal district court against the party named in the charge. *See id.* Thus, while the statute requires that the complainant institute administrative proceedings through the EEOC, it does not require a complainant to wait indefinitely for an EEOC conclusion—the right-to-sue letter may be requested at any point after 180 days have passed, and the EEOC must issue the letter upon such request. *See McNasby,* 888 F.2d at 274 n. 3. Indeed, "[a]t the end of the 180–day period the employee is entitled to sue, regardless of [the status of] EEOC proceedings." *Waiters v. Parsons,* 729 F.2d 233, 237 (3d Cir.1984).

The Third Circuit acknowledges that demanding the right-to-sue letter is not generally required of a complainant, but it has also stated that there exist certain circumstances in which "a plaintiff in an employment discrimination case may have to forego administrative remedies and obtain an early right-to-sue letter." *Churchill,* 183 F.3d at 193. In *Churchill,* the plaintiff, Mary Churchill, had received a jury determination in her favor on claims arising under the Family and Medical Leave Act of 1993, 29 U.S.C. §§ 2601–2654 ("FMLA"). *Id.* at 187. Churchill instituted her FMLA action on May 20, 1997, and received a final judgment in her favor on February 13, 1998. *Id.* at 188. On February 26, 1997, prior to filing her initial complaint, Churchill had filed an administrative complaint with both the EEOC and a state civil rights agency, asserting a claim under the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.* ("ADA"). *Id.* Over one year later, on April 2, 1998, Churchill instituted a second suit predicated on her ADA claims. *Id.* On April 26, 1998, Churchill received a right-to-sue letter from the EEOC—a letter that she had never requested. *Id.*

The Third Circuit found that "Churchill could have requested a right-to-sue letter . . . and attempted to join the ADA claim to the FMLA claim in consolidated litigation." *Id.* at 191. In ruling that the doctrine of claim preclusion barred her ADA claims, the Court found that she had "sat on her rights" when she could have pursued a variety of remedies to preserve her claims. *Id.* In particular, the Court stated that Churchill could have sought a stay of the FMLA proceedings "while she waited for the right-to-sue letter, and by that procedural step preserved [her subsequent] claims." *Id.* The Court further counseled that "[a]ttorneys should organize litigation . . . to avoid claim preclusion." *Id.*

Moreover, in finding that Churchill had "sat on her rights," the Third Circuit "agree[d] with the[ ] persuasive decisions" of the Sixth, Seventh, and Second Circuits, which "held that a plaintiff in an employment discrimination case may have to forego administrative remedies and obtain an early right-to-sue letter." *Id.* at 193 (citing *Heyliger v. State Univ. & Community College Sys. of Tenn.,* 126 F.3d 849, 855 n. 2 (6th Cir.1997), *cert. denied,* 522 U.S. 1117, 118 S.Ct. 1054, 140 L.Ed.2d 117 (1998); *Herrmann v. Cencom Cable Assocs., Inc.,* 999 F.2d 223, 225 (7th Cir. 1993); *Woods v. Dunlop Tire Corp.,* 972 F.2d 36, 40 (2d Cir.1992)). In deciding *Heyliger,* the Sixth Circuit addressed facts similar to the ones before this Court. *See Heyliger,* 126 F.3d at 851. The Third Circuit's adoption of *Heyliger's* "persuasive" reasoning and the similarity between its facts and those before this Court warrant a closer examination of *Heyliger.*

In *Heyliger,* the plaintiff, Wilton Heyliger, had filed a Title VII race-based complaint with the EEOC in September 1990. *See id.* In December 1990, Heyliger, a black male, filed a complaint in state court,

rector, the Area Director, the Local Director, the Program Director, Office of Program Operations or upon delegation, the Director of Systemic Programs, Office of Program Operations or the Directors, Field

Management Programs, Office of Program Operations has determined that it is probable that the Commission will be unable to complete its administrative processing of the charge within 180 days from the filing

alleging violations of the Tennessee Human Rights Act, T.C.A. § 4–21–101 *et seq.* *See id.* On November 19, 1993, almost a full three years from the filing of the state complaint, the state court granted summary judgment against Heyliger. *See id.* Two months later, on January 12, 1994, the EEOC issued Heyliger a right-to-sue letter. *See id.* Heyliger then filed a Title VII complaint in federal court on April 13, 1994. *See id.* The Sixth Circuit applied Tennessee's law of claim preclusion, which "bars consideration of all claims that were or reasonably could have been litigated . . . in the state court action," *id.* at 854 (quoting *Whitfield v. City of Knoxville,* 756 F.2d 455, 459–60 (6th Cir.1985)) (citing *Grange Mut. Cas. Co. v. Walker,* 652 S.W.2d 908, 909–10 (Tenn.1983)), and held that "the prior adjudication in state court barred Heyliger's action in federal court." *Heyliger,* 126 F.3d at 856.

The application of claim preclusion to Heyliger's Title VII claims rested squarely on the court's determinations that "Heyliger could have requested, and been entitled to receive . . . forthwith, a right-to-sue letter, . . . [and that he then] could have folded his Title VII claim into his action in state court." *Id.* at 855–56. The Court concluded that "[r]equiring a plaintiff in Heyliger's shoes to seek a right-to-sue letter and to amend his complaint does not exceed the burden of a due diligence standard," *id.* at 856, and that "Heyliger's Title VII claim 'reasonably could have been litigated in state court.' " *Id.* (citing *Whitfield,* 756 F.2d at 459).

▇▇ In the instant case, Dowdell filed his EEOC charge on April 11, 1997, and he did not pursue his state action until August 12, 1998—some 480 days following the initial EEOC filing. Under even the most liberal construction of the statute, Dowdell enjoyed a period of many months in which he could have elected to end the administrative process and demand a right-to-sue letter. Dowdell's failure to do so restricts the relief this Court can now extend. To allow Dowdell to continue the instant federal action would ignore the primary purpose of claim preclusion, which "is to avoid piecemeal litigation of claims arising from the same events." *Churchill,* 183 F.3d at 194.

The Third Circuit has stated explicitly that requiring a plaintiff to obtain the right-to-sue letter and stay pending proceedings "is not an onerous burden." *Id.,* at 193. Had Dowdell undertaken these simple measures, requiring only due diligence on his part, his Title VII claims could have been added to his NJLAD claims without difficulty. *See id.* (citing *Heyliger,* 126 F.3d at 856). In deciding that such a failure to consolidate his claims precludes Dowdell's present suit, this Court follows the Third Circuit's recent controlling pronouncement in *Churchill.*[13]

As with the plaintiff in *Churchill,* Dowdell could have obtained his right-to-sue letter without difficulty; or he could have stayed the state proceedings pending receipt of the letter; or he could have requested the letter months before initiation of the state proceedings, thereby foregoing the need for any stay.[14] Had he undertaken any of these efforts, Dowdell could have brought all of his instant claims before a single tribunal of his choice, either federal or state.

▇▇ Dowdell, however, took no such actions. Instead, he pursued a course of

of the charge and has attached a written certificate to that effect.

**13.** Although the plaintiffs in both *Churchill* and *Heyliger* enjoyed greater consideration of their original claims than Dowdell (Mary Churchill received a favorable verdict on her FMLA claims, and Wilton Heyliger progressed to the summary judgment phase on his state discrimination claims), it is not within

the power of this Court to grant Dowdell either a new or longer day in court under existing law.

**14.** Dowdell fails to allege either that he sought a stay of the state proceedings, or that he made any attempt to obtain his right-to-sue letter. Thus, this Court does not address the applicability of the enumerated preclusion doctrines to a fact situation in which either a

piecemeal litigation disallowed under both the entire controversy doctrine[15] and federal claim preclusion law. Each of these legal rules "require a plaintiff to present all claims arising out of the same occurrence in a single suit." *Athlone Indus.*, 746 F.2d at 983–84; *see Churchill,* 183 F.3d at 194.

The sole remaining question concerns whether Dowdell's instant claims arise out of the same occurrence which supported his state claims. Resolution of this question requires determinations regarding "whether the acts complained of were the same, whether the material facts alleged in each suit were the same, and whether the witnesses and documentation required to prove such allegations were the same." *Athlone Indus.,* 746 F.2d at 984. The mere fact that Dowdell predicates his instant claims on Title VII, rather than the NJLAD, does not bar preclusion of these claims. *See Churchill,* 183 F.3d at 195. The fact that "the acts complained of [are] the same and that the evidence at [a federal] trial would [be] the same" necessitate a finding that this action and the state action are identical. *Id.* Dowdell's termination and its surrounding events served as the basis for both his state and federal complaints.[16] Given that any evidence presented would be the same, that the material facts alleged are the same, and that the alleged wrongful conduct is the same, this Court finds that Dowdell now raises claims predicated on events indistinguishable from those raised in his state complaint.

This Court's findings—that Dowdell's instant claims derive from the same acts as relied upon by his state claims, and that Dowdell could have consolidated both sets of claims into his original action—preclude further prosecution of the instant suit. Dowdell's failure to pursue his federal claims diligently and the mandates of the doctrine of claim preclusion require this Court to dismiss each of Dowdell's remaining Title VII claims.

### CONCLUSION

For the reasons discussed, defendant UMDNJ's motion to dismiss is granted as to Dowdell's entire complaint. Based on this Court's ruling, UMDNJ's motion seeking summary judgment is denied as moot.

*An appropriate order has been filed.*

---

desired stay is denied, or a requested right-to-sue letter is withheld by the EEOC.

15. Having determined that Dowdell could have raised his Title VII claims in the earlier suit, this Court notes that, as an alternative to the instant application of federal claim preclusion, the entire controversy doctrine would be sufficient to bar Dowdell's Title VII claims. *See* Part II *supra* pp. 534–35 (discussing necessity of determining that new claims could have been raised during earlier proceeding in order to employ doctrine's proscriptions).

16. The addition of new allegations regarding UMDNJ's failure to hire Dowdell does not render the instant cause of action distinguishable. Identity remains because: (1) these "new" allegations and their underlying events were known to Dowdell at the time he filed his state complaint; (2) they arise from the same course of conduct that forms the core of Dowdell's instant action; and, (3) the "artful pleading" by attorneys of secondary allegations in a subsequent complaint has been explicitly rejected as a means of surmounting a preclusion bar. *Churchill,* 183 F.3d at 195 n. 10.